1

2

3

4

5

6                            UNITED STATES DISTRICT COURT

7                          NORTHERN DISTRICT OF CALIFORNIA

8

9    SOUNEY KEOPHAN,                          No. C 09-1137 MHP (pr)

10              Petitioner,                   **ORDER DENYING HABEAS
                                              PETITIONS AND DENYING**
11        v.                                  **CERTIFICATES OF
                                              APPEALABILITY**
12   ROBERT A. HOREL, Warden,

13              Respondent.
                                        /
14

15   PHAYBOON KHENSOKVANN,                    No. C 09-1220 MHP (pr)

16              Petitioner,

17        v.

18   FRANCISCO JACQUES, Warden,

19              Respondent.
                                        /
20

21                                   **INTRODUCTION**

22        Petitioners, who were codefendants at trial, filed separate pro se actions seeking writs

23   of habeas corpus under 28 U.S.C. § 2254.  The court granted respondent Horel's motion to

24   relate the cases, which resulted in Khensokvann's case being reassigned to the undersigned.

25   The matters are now before the court for consideration on the merits.  For the reasons

26   discussed below, the petitions will be denied.

27                                   **BACKGROUND**

28        Petitioners Souney Keophan and Phayboon Khensokvann were tried with

     codefendants Sary Lour and Naris Keobunta.  Keophan and Khensokvann were convicted of

*United States District Court*
*For the Northern District of California*

conspiracy to commit burglary, participating in a criminal street gang, and possession of burglary tools.  Khensokvann was also convicted of receiving stolen property, and Keophan of false impersonation of another.  The jury found the arming and gang enhancements true as to all the charges upon which it convicted them.   Keophan was sentenced to prison for a term of thirteen years, and Khensokvann was given a nineteen year term.

The state appellate court provided this summary of the evidence:

At 1:45 p.m. on January 18, 2006, San Jose Police Officer Glenn Albin and Los Gatos Police Officer Mike D'Antonio were working as undercover narcotics agents in northeast San Jose. The officers were wearing plain clothes and were in an unmarked SUV that was stopped at the intersection of Hostetter and Morrill at a traffic light.

While waiting at the stop light, the officers saw a white Chevy Tahoe SUV turn left from Morrill onto Hostetter. Albin saw that the windows on the Tahoe were tinted, and based on how dark the tinting was, and the fact that he could not see clearly into the SUV, he believed the tinting was illegal. D'Antonio called the Los Gatos Police Department for a registration check and found the Tahoe was registered to an owner in Long Beach, California.

The Tahoe proceeded to drive east on Hostetter, then south on Stebbins. It moved about five to 10 miles per hour, and the driver was riding the brakes. Albin got out of his car to watch the Tahoe, and saw that the brake lights continued to go on and off while it went down the street. At the end of the street, the Tahoe made a U-turn, and came back toward Albin, who could then see there were two Asian men in the front of the car. As the car was driving along the street, Albin could see one man look one direction, and the other man look the other direction.

The Tahoe drove past Albin, turned back onto Hostetter eastbound, and went to the next street, Turiff, and turned south. Albin drove to the intersection of Hostetter and Turiff, got out of his car and watched the Tahoe. Albin saw the Tahoe drive slowly down Turiff, with the driver riding the brakes. At the end of Turiff, the Tahoe turned left, and Albin could no longer see it for a while. Albin got back into his car and drove in the direction the Tahoe had gone, and when he saw the Tahoe again, it was parked on the curb line in front of 1426 Danby. Albin saw a passenger get out of the Tahoe from the door behind the driver, and walk towards the house, where Albin lost sight of him. The passenger then returned to the Tahoe, leaned into the driver's window for a few moments, and then re-entered the car.

Based on his observations of the driving of the car, the passenger's activity and the tinted windows, Albin decided to initiate a car stop of the Tahoe. Albin drove his SUV to the front of the Tahoe, and angled it so that his front bumper was about a foot from the Tahoe's front bumper, and the Tahoe was blocked from moving forward. At the time, the back windows of the Tahoe were up, and the front driver's window was partially down. As they were pulling up, both Albin and D'Antonio held up their badges and yelled. "Police, stop." Albin could see four occupants of the Tahoe through the windshield, which was not tinted.

Albin and D'Antonio got out of the car. Albin drew his gun and held it at his side. He

believed at the time that the occupants of the Tahoe were burglars, knew about a recent residential burglary in the area where a gun was stolen, and also knew that residential burglars often carry guns. Both he and D'Antonio both identified themselves as police officers by yelling "Police, stop."

Albin saw the driver's window go down, and the Tahoe began to move in reverse. Albin pointed his gun at the car and yelled at the driver to stop. D'Antonio also pointed his gun at the Tahoe. After driving backward for a few feet, and driver of the Tahoe stopped the car. Albin and D'Antonio walked to the front of the Tahoe and pointed their guns at it. Albin told the occupants to put their hands where he could see them. The front passenger was having difficulty keeping his hands on the dashboard, and seemed nervous. D'Antonio ordered the driver to get out, at which point D'Antonio holstered his gun, and directed the driver to the back of the Tahoe. The driver of the Tahoe was appellant, Khensokvann.

Albin then saw a scanner underneath the center console of the Tahoe. The scanner was scanning different channels, and Albin could hear an occasional San Jose police unit or dispatch. After Albin saw the scanner, and some two-way radios inside the Tahoe, D'Antonio handcuffed the driver and had him sit on the curb.

Albin went to the passenger's side and had the passenger get out of the car. The front passenger was appellant, Lour who told D'Antonio he was on probation. D'Antonio pat-searched the passenger and removed a gun from his clothing. Albin then radioed for back-up. When those officers arrived, they assisted Albin and D'Antonio in removing the backseat passengers from the Tahoe.

The Tahoe was searched, and inside was found the operable police scanner that was tuned to San Jose radio traffic. There was a set of 2-way radios. A pair of knit gloves, as well as a red handled screwdriver were found. In the glove compartment were a pair of binoculars, and a letter addressed to Khensovann. In the rear cargo area of the Tahoe were a pair of nunchuks, a flashlight, and a bag of rubber gloves.

The person who was seated behind the driver, and had gotten out of the car to go up to 1426 Danby was co-defendant Keobunta. Appellant Keophan was seated in the back seat on the passenger side. Keobunta told D'Antonio that he got out of the car and went to the door of the house looking for a person named Mindy. He knocked on the door and asked if Mindy was there and the person said she was not.

About 10 minutes after the stop, Albin, D'Antonio and another officer went to the front door of 1426 Danby to talk to the occupant. Through an open window next to the front door, Albin could see two children playing at a kitchen table. Albin knocked at the door, and a woman came to the door. The woman testified that she lived at 1426 Danby, and that she was the only adult home on the afternoon of January18. She further testified that the police officers were the only people who knocked on the door that afternoon, and that no one asked her if Mindy lived there.

At the time of the stop, Khensokvann was wearing solitaire diamond earrings belonging to the Via Crusis family, whose home in Porterville, California FN2 was burglarized on the afternoon of December 2, 2005. Lour was wearing diamond flower patterned earrings also belonging to Mrs. Via Crusis. The gun that was found in Lour's possession was registered to Manuel Via Crusis.

FN2. Porterville is located about 150 miles south of San Jose, and is north of Long Beach where appellants lived.

3

With regard to the burglary of the Via Crusis home in Porterville, Manual and Penny Via Crusis testified that their home was burglarized on the afternoon of December 2, 2005. The burglars cut the screen door in front and forced the inside door open. Mercedes Munoz, a neighbor of the Via Crusises testified that between 12:00 and 1:00 p.m. on December 2, she was walking to her mailbox. She saw a white SUV parked in front of the Via Crusises' home. When she was shown photographs of the Chevy Tahoe appellants were driving in this case, she said it looked similar to the one she saw in her neighborhood. Munoz saw through the driver's window an Asian male between 24 and 36 sitting in the driver's seat. She saw another Asian male of about the same age come from the house and stop between it and the car. Munoz testified that the driver did not get out to the car, and that she did not know what the men were doing. She said the car was there for a total of 10 minutes. Munoz could not identify any of the men in court as those she saw the day of the burglary of the Via Crusis residence.

Keophan's home in Long Beach was searched following the arrest in this case. The police found a functioning diamond tester, as well as a traffic ticket showing Keophan had driven the Tahoe on December 20, 2005, in an area near Porterville. The parties stipulated at trial that Keophan was stopped on Highway 65 by a California Highway Patrol officer while driving the Tahoe. Keophan told the officer he was dropping off a friend in Porterville.

Gang Evidence
Detective Galvan of the Long Beach Gang Enforcement Unit testified as an expert in Asian criminal street gangs. Galvan testified that Suicidals is a Southeast Asian gang in Long Beach that is made up of primarily Cambodian members. The Suicidals is structured informally, and has about 100 members. The primary criminal activities of the Suicidals include attempted murder, assault with a deadly weapon, robbery, burglary, auto theft, narcotics sales and residential burglary.

The prosecution introduced into evidence People's Exhibits 48, and 49, that were certified records of conviction of Bubemme Siprasert for narcotics sales, and Dhonee Chamroeun for grand theft, respectively. Galvan testified that both Siprasert and Chamroeum are members of the Suicidals.

Galvan testified about another criminal street gang called the Asian Boys that was similar in structure to the Suicidals, and had been in existence for more than 15 years, and had about 400 members. The primary criminal activities of the Asian Boys includes murder, attempted murder, assault, robbery, extortion, auto theft, auto burglary, and residential burglary.

The Suicidals and Asian Boys are some of a group of gangs that ally together in wars between gangs, and members of the Suicidals and the Asian Boys have been involved in theft crimes together. Some Suicidals and Asian Boys are members of the same families.

Galvan testified that Asian gangs tend to target the Asian community in committing crimes. Asian immigrants who do not speak English are typical targets, many of whom mistrust banks, and keep jewelry and cash in their homes. Many thefts committed by the Suicidals and Asian Boys were of cash and jewelry from homes, with jewelry being taken to pawn shops and resold.

Suicidals and Asian Boys would often leave Long Beach to commit crimes, because it was harder for police to identify them in other cities and counties. For residential burglaries, gang members would drive around a neighborhood a few times to see who

4

was around and to watch houses. Gang members could use walkie-talkies and police scanners to see if the police were in the area.

Galvan testified regarding the gang affiliations of appellants in this case. Khensokvann was a member of the Suicidals, had a Suicidal tattoo, and used the gang moniker "Stalker," and admitted to gang membership Keophan was a member of the Asian Boys, had Asian Boys tattoos, used the gang moniker, "Little Baby," and admitted to gang membership. Keobunta was a member of the Suicidals, had Suicidal tattoos, used the gang moniker, 'Shaggy," and admitted to gang membership. Lour was an affiliate of the Suicidals. His older sister Katie Lour, who had two children with Keophan, had been a member of the Suicidals, and his younger brother, Randy was a member. Lour never admitted to being in the Suicidals, but Katie and other gang officers told Galvan that Lour was an affiliate.

The prosecutor at trial asked Galvan a hypothetical question to assume the circumstances of the San Jose incident were true and that appellants had conspired to commit a residential burglary. Galvan testified that appellants were acting for the benefit of and in association with a gang. Galvan further testified appellants were acting for the benefit of a gang if they possessed the stolen property from the Porterville burglary, the burglar's tools and the nunchuks. Galvan stated that in his opinion, Lour possessed the firearm for intimidation and/or protection, and in doing so, he was acting for the benefit of a gang.

Resp. Ex. H, California Court of Appeal Opinion ("Cal. Ct. App. Op."), at 2-7.

Keophan, Khensokvann and Lour appealed.  In a joint opinion, the California Court of Appeal affirmed as to Keophan and Khensokvann.  It struck a restitution order applicable to Lour but otherwise affirmed as to him as well.  The California Supreme Court denied the petitions for review of Keophan and Khensokvann.

Keophan and Khensokvann then filed habeas actions here.  Their identical petitions were dismissed with leave to amend.  They filed identical amended petitions.  The court then dismissed claim one of each petition and ordered respondents to show cause on the other claims.  Those were that: (1) the trial court violated their Sixth and Fourteenth Amendment right to a fair trial by denying their motions to sever trial of the gang allegations from trial of the other counts; (2) their right to due process was violated by admission of evidence of an uncharged burglary in Porterville; and (3) the evidence was insufficient to show that the charged offenses were gang-related.  These three claims of each petition are now ready for decision on the merits.

## STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.

## DISCUSSION

A.    Motion to Sever

Petitioners contend that the trial court violated their due process and fair trial rights by denying their motion to sever the gang enhancements and the substantive charges of participating in a criminal street gang from the other, non-gang, charges.  This claim was presented on direct appeal, where the court of appeal held:

[A]lthough appellants now assert the other evidence at trial was sufficient to

1   demonstrate motive and intent in the absence of the gang evidence, at trial, appellants
2   asserted a different theory as a defense. Appellants argued they were unaware of the
    stolen property inside the Tahoe at the time they were riding in it, they were not
3   involved with the Porterville burglary, and they were driving though [sic] the
    neighborhood slowly at the time they were stopped because they were helping
4   Keobunta find his old girlfriend. Therefore, by appellants' own arguments at trial, the
    evidence found inside the Tahoe and their conduct were not enough to prove intent
5   and motive to demonstrate conspiracy to commit burglary. Evidence of appellants'
    gang affiliations was relevant to demonstrate that the group was in the neighborhood
6   conspiring to commit a residential burglary, and was "important to the motive" in this
    case. (Martin, supra, 23 Cal.App.4th at p. 81.) The trial court did not err in denying
7   appellants' motion to bifurcate the gang enhancements and sever count 2.

8   Cal. Ct. App. Op. at 20.

9       A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern

10  itself with state law governing severance or joinder in state trials. Id. Nor is it concerned

11  with procedural rights to severance afforded in federal trials. Collins v. Runnels, 603 F.3d

12  1127, 1131-32 (9th Cir. 2010) (finding that Supreme Court decisions addressing severance

13  under federal rules do not apply to analysis of whether joinder in state courts was

14  constitutional). Its inquiry is limited to the petitioner's right to a fair trial under the United

15  States Constitution. Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997). To prevail,

16  therefore, the petitioner must demonstrate that the state court's joinder or denial of the

17  severance motion resulted in prejudice great enough to render the trial fundamentally unfair.

18  Id. In addition, the impermissible joinder must have had a substantial and injurious effect or

19  influence in determining the jury's verdict. Sandoval v. Calderon, 241 F.3d 765, 772 (9th

20  Cir. 2000).

21      Petitioners argue that the gang evidence was not relevant to the non-gang charges and

22  enhancements, and that the jury was likely to conclude from their gang membership that they

23  were guilty of the non-gang offenses – that is, the evidence was both irrelevant and highly

24  prejudicial, so much so that denying severance violated due process. Pet. at 7; Traverse at 7-

25  10.

26      The Ninth Circuit has said that it "focuses particularly on cross-admissibility of

27  evidence and the danger of 'spillover' from one charge to another, especially where one

28  charge or set of charges is weaker than another." Davis v. Woodford, 384 F.3d 628, 327 (9th

Cir. 2004); see also Sandoval, 241 F.3d at 772-73 (cross-admissibility "dispels the prejudicial impact of joining all count in the same trial;" but also considering whether one charge much weaker than the other).

Here, the California Court of Appeal held that the evidence was cross-admissible. Cal. Ct. App. Op. at 20.  That holding is binding on this court, see Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus). And the evidence of the conspiracy to commit burglary outlined in the quotation above from the court of appeal, though perhaps not as strong as the virtually undisputed gang evidence, is still very strong.  When combined with the fact that the jury was instructed to compartmentalize the evidence as to each of the charges, RT 1280, and the legal principle that jurors are presumed to follow their instructions, see Weeks v. Angelone, 528 U.S. 225, 234 (200), it is clear that there was no significant "spillover" danger.  Because neither of the concerns about joinder of charges that the Ninth Circuit has expressed are present here, there was no due process violation.  Petitioners' claims regarding severance are without merit.

B.    Admission of Uncharged Offense

This issue was raised on direct appeal.  The court of appeal set out the background:

> The trial court allowed Mercedes Munoz to testify that she saw a white vehicle and two Asian males in the vicinity of the Via Crusis home on the date of the burglary, as well as evidence that 18 days after the burglary appellant Keophan received a traffic ticket while driving the Tahoe in the Porterville area.

> The trial court admitted the evidence to demonstrate intent, motive, and that appellants knew the objects found in the Tahoe were stolen, with a limiting instruction to the jury that provided, in part: "the People are about to present evidence about activities that are not charged in this case. You may consider this evidence only if the People have proved by a preponderance of the evidence that a defendant, in fact, committed the uncharged acts.... [¶] ... If you decide a defendant committed the uncharged act, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the defendant acted with the intent to commit residential burglary in San Jose; or the defendant knew that the property found in the Chevrolet Tahoe was stolen when they allegedly acted in this case; or the defendant had any plan or scheme to commit the offense alleged in this case." A similar limiting instruction was included in the court's final instructions to the jury as well.

Cal. Ct. App. Op. at 20-21.  In addition, when petitioners were stopped for this offense petitioner Khensokvann and codefendant Lour were wearing jewelry stolen in the Porterville

1   burglary, and Lour had a gun that had been taken in that burglary.  Id. at 5.  On appeal,

2   petitioners had argued that the testimony of the owners was sufficient to demonstrate that the

3   property found in petitioners' possession was stolen and that petitioners knew it was stolen.

4   Id. at 21.  The court of appeal rejected this contention, noting that although it was true, that

5   did not make additional evidence as to the point inadmissible.  Id.  The court also held that

6   the evidence was indeed admissible on the issue of intent.  Id.

7           The Ninth Circuit has held that the Supreme Court "has not yet made a clear ruling

8   that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation

9   sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th

10  Cir. 2009).  As a result, there is no "clearly established federal law, as determined by the

11  Supreme Court of the United States," 28 U.S.C. § 2254(d), applicable to these claims, and

12  relief cannot be granted.

13          Alternatively, there was no constitutional violation on these facts.

14          As the Ninth Circuit has explained, admission of evidence is not subject to federal

15  habeas review unless a specific constitutional guarantee is violated or the error is of such

16  magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.

17  Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  While adherence to state evidentiary

18  rules suggests that the trial was conducted in a procedurally fair manner, it is certainly

19  possible to have a fair trial even when state standards are violated; conversely, state

20  procedural and evidentiary rules may countenance processes that do not comport with

21  fundamental fairness.  Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  Thus,

22  that the California Court of Appeal has held that there was no state violation is not

23  determinative.

24          Only if there are no permissible inferences that the jury may draw from the evidence

25  can its admission violate due process, however.  Id. at 920.  Here, there clearly were

26  legitimate inferences the jury could draw from the evidence of the Porterville burglary,

27  namely that the items found in the van were stolen – one of the charges was possession of

28  stolen property – and that petitioners' actions in casing the neighborhood were with the intent

1   of committing burglary, going to the conspiracy to commit burglary charge. There thus was

2   no due process violation.

3   C.      Sufficiency of the Gang Evidence

4           California law provides that a sentence can be enhanced if the crime was committed

5   "for the benefit of, at the direction of, or in association with any criminal street gang ...."

6   Cal. Penal Code § 186.22 (b)(1). Petitioners contend that the only evidence supporting the

7   enhancement was that they and their cohorts were gang members, which they contend was

8   not enough to support the jury's finding that the enhancement allegations under this clause

9   were true.

10          Petitioners each raised this claim on direct appeal, arguing that although the

11  defendants were all gang members, there was no evidence that the offense was committed for

12  the benefit of a gang. The court of appeal noted that under California law, the enhancement

13  can be imposed not only for crimes committed for the benefit of, or at the direction of, a

14  criminal street gang, but also "in association with" a criminal street gang, and that the

15  evidence that they all were gang members was enough, in the absence of any indication that

16  the burglary conspiracy was a "frolic and detour" from their gang occupations, to support the

17  gang enhancement. Cal. Ct. App. Op. at 15-16 (quoting "frolic and detour" language of

18  People v. Morales, 112 Cal.App.4th 1176, 1198 (2003)).

19          As noted above, under California law a crime committed by gang members who were

20  not on a "frolic and detour" is by definition a crime committed "in association with"a

21  criminal street gang. Thus, when petitioners argue that the fact that they were gang members

22  was not sufficient evidence in itself, and do not dispute the all the perpetrators were gang

23  members nor contend that they were on a frolic and detour, they are in essence arguing that

24  that California law is in error, rather than that the evidence was insufficient. Such claims

25  cannot be the basis for federal habeas relief. See Wilson v. Corcoran, 131 S.Ct. 13, ___,

26  (Nov. 8, 2010) (reversing grant of habeas relief for violation of state law; federal habeas

27  relief lies only for violations of federal law); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)

28  (federal habeas unavailable for violations of state law or for alleged error in the interpretation

10

1    or application of state law).  These claims are rejected for that reason.

2         Alternatively, even if the claims are construed as sufficiency of the evidence claims,

3    they have no merit.

4         The Due Process Clause "protects the accused against conviction except upon proof

5    beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

6    charged."  In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

7    evidence in support of the state conviction cannot be fairly characterized as sufficient to lead

8    a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional

9    claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles the petitioner

10   to federal habeas relief, id. at 324.  The federal court determines only whether, "after viewing

11   the evidence in the light most favorable to the prosecution, any rational trier of fact could

12   have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  Only

13   if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has

14   there been a due process violation.  Id. at 324.  And after the AEDPA, a federal habeas court

15   applies the standards of Jackson with an additional layer of deference, asking whether the

16   state court's application of Jackson was objectively unreasonable.  Juan H. v. Allen, 408 F.3d

17   1262, 1275, 1278-79 (9th Cir. 2005).

18        It is decisive here that a federal "sufficiency of the evidence" inquiry is channeled by

19   state law – although federal law requires sufficient evidence, it is state law that sets out the

20   elements as to which there must be sufficient evidence.  Sarausad v. Porter, 479 F.3d 671,

21   678 (9th Cir. 2007) (Jackson standard must be applied with explicit reference to the

22   substantive elements of the criminal offense as defined by state law).[1]  As discussed above,

23   the "in association with" prong of the California gang statute is met if the crime is committed

24   by gang members who are not on a frolic and detour.  Here there is no ground in the record

25   for dispute on either point.  There thus was constitutionally sufficient evidence to support the

26   jury's findings as to the enhancements.

27   D.    Appealability

28         A certificate of appealability will not issue.  See 28 U.S.C. § 2253(c).  These are not

     cases in which "reasonable jurists would find the district court's assessment of the

11

1  constitutional claims debatable or wrong."  <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)

2  (standard).

3  <center>**CONCLUSION**</center>

4        The petitions for writ of habeas corpus are both DENIED on the merits.  The clerk

5  shall close the files.

6        IT IS SO ORDERED.

7  DATED: January 12, 2011

8                                                  Marilyn Hall Patel
                                                   United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**<u>ENDNOTES</u>**

3

4

5

1.   Petitioners do not challenge the constitutionality of the California law that allows enhancement of sentences for crimes committed in "association" with a street gang and defines "in association" to include such crimes when committed by gang members.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28